UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RON AND ELIZABETH LANINGHAM, as next   §
friend to SAMANTHA SANCHES,   §
  §
      Plaintiffs,   §
  §
vs.   §     CIVIL ACTION NO. 3:08-CV-1559-BF
  §
CARROLLTON-FARMERS BRANCH   §
INDEPENDENT SCHOOL DISTRICT,   §
  §
      Defendant.   §

## MEMORANDUM OPINION AND ORDER

This is a consent case before the United States Magistrate Judge. The Motion for Summary Judgment ("Motion," doc. 35) of Defendant Carrollton-Farmers Branch Independent School District ("Defendant" or "CFBISD" or "the District") is before the Court for consideration. Plaintiffs Ron and Elizabeth Laningham, as next friend to their daughter Samantha Sanches ("Plaintiffs"), filed a Response and Defendant filed a Reply.

Defendant contends that summary judgment on Plaintiffs' Title IX claim is proper because: (1) Plaintiffs have no evidence of harassment that was a result of gender bias; (2) the alleged harassment of Plaintiffs' daughter by another female student was not so severe, pervasive, and objectively offensive that it can be said to have deprived the daughter of access to educational opportunities or benefits provided by the school; and (3) Defendant was not deliberately indifferent to Plaintiffs' allegations of harassment. Defendant urges that Plaintiffs have failed to raise a genuine issue of material fact with respect to any of these grounds. Plaintiffs, on the other hand, contend that genuine issues of material fact exist with respect to whether at least five separate incidents were student-on-student sexual harassment. They urge that they have raised a genuine issue of material fact with respect to whether Sanches suffered severe and pervasive sexual harassment. They

contend that genuine issues of material fact exist with respect to whether the harassment badly affected Sanches' ability to learn and deprived her of the opportunity to be educated and to have an equal opportunity to learn.  Plaintiffs further contend that genuine issues of material fact exist with respect to the District's Title IX practices: whether the practices constitute unconstitutional gender bias; whether there is a widespread, consistent pattern of misconduct by the District; and whether the District was deliberately indifferent to Plaintiffs' complaints.

### Standard of Review

Summary judgment is appropriate when the pleadings and the evidence show that  no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, the court views the facts in the light most favorable to the non-moving party. *Whittaker v. BellSouth Telecomms., Inc.*, 206 F.3d 532, 534 (5th Cir. 2000) (citations omitted).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.  Once a properly-supported motion for summary judgment is made and the movant has met his burden, the non-moving party must go beyond the pleadings and set forth specific facts showing that a genuine issue exists for trial. *Anderson*, 477 U.S. at 250.  This burden is not satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).  There

must be evidence giving rise to reasonable inferences that support the non-moving party's position. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987).

### **Student-on-Student Sexual Harassment Protected by Title IX**

In *Davis v. Monroe*, 526 U.S. 629, 642 (1999), the United States Supreme Court held that the recipients of federal educational funds may be held liable for violations of Title IX, 20 U.S.C. § 1681(a), pursuant to § 1983 if they are deliberately indifferent to known acts of student-on-student sexual harassment. Title IX provides that: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Liability attaches only in instances where the recipient's response to the harassment, or lack of response, is "clearly unreasonable in light of the known circumstances" and the harassment itself is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 648, 650. Liability does not attach on the basis of "simple acts of teasing and name-calling among school children," such as: (1) an overweight child who skips gym class because she is teased about her weight; (2) a child who refuses to wear glasses because other students call her "four-eyes"; and (3) a child who refuses to go to school because a bully calls her "scaredy-cat" at recess. *Id*. at 652. To be actionable under Title IX, the offensive behavior must be based on sex, rather than personal animus or other reasons. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (11th Cir. 2002). *See Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81 (1998) (holding that in same-sex harassment cases as in all sexual harassment cases, the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations," but in fact

constituted "discrimination . . . because of . . . sex."  *Id.*  Moreover, simply because an act could be characterized as sexual harassment does not mean that it automatically rises to a level of severity that deprives a student of access to educational opportunities.  *See Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003).  "Whether gender-oriented conduct rises to the level of actionable harassment thus depends on a constellation of surrounding circumstances, expectations, and relationships." *Davis,* 526 U.S. at 651 (internal quotation marks and citation omitted).  Such circumstances include, but are not limited to, the ages of the parties involved.  *Id.*  Courts should also take into account the fact "that children may regularly interact in a manner that would be unacceptable among adults" and that they exhibit a "dizzying array of immature . . . behaviors."  *Id.*

A school district is liable for damages under Title IX only where the district itself remains deliberately indifferent to known acts of harassment.  *Davis,* 526 U.S. at 642-43.  In describing the proof necessary to satisfy the standard, the Supreme Court has stated that a plaintiff may demonstrate the school district's deliberate indifference to discrimination "only where the [school district]'s response to the harassment . . . is clearly unreasonable in light of the known circumstances." *Id.* at 648.  This "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* Victims do not have a right to seek particular remedial demands, and courts should not second guess school administrators' disciplinary decisions.  *Id.*

4

## **Background Facts Leading Up To Plaintiffs' Title IX Claim**

These are the background facts leading up to the complained-of incidents which constitute Plaintiffs' claims of sexual harassment and gender discrimination.  Plaintiffs Elizabeth Laningham and Ron Laningham are the mother and stepfather of Samantha Sanches.  (Def.'s App. at 315-16.) Sanches has been a student in the CFBISD since fifth grade.  (*Id.* at 317.)  Sanches started cheerleading in the eighth grade and became a student at Creekview High School in her freshman year. (*Id.* at 317, 320.) Plaintiffs complained about more than thirty separate issues directly relating to cheerleading before Sanches started high school.  (*Id.* at 5-14, 20-73, 78-197, 208-224, 342-413.) Before Sanches' freshman year in high school, Mrs. Laningham protested another child's selection as cheerleader.  As a result, the District added Sanches to the freshman squad. (*Id.* at 362-65.) During Sanches' freshman year, Mrs. Laningham attempted to have a student removed as captain of the freshman team because that child had kissed Sanches' boyfriend.  (*Id.* at 78-83, 242-44, 365-67.) Mrs. Laningham alleges that this incident constitutes "sexual harassment" of her daughter.  (Id. at 409.)  Mrs. Laningham went on the radio to publicly complain about a thirteen-year-old girl kissing her daughter's boyfriend.  (*Id.* at 244, 367-69.)  During Sanches' sophomore and junior years at Creekview, Mrs. Laningham complained about: (1) stunting groups (*id.* at 103-08, 370-72); (2) booster club procedures (*id.* at 84-102, 347-53); (3) the cheerleader banquet (*id.* at 112-18, 372-76); (4) the cheerleader video (*id.* at 120-26, 379-83); (5) underclassmen having to sleep on the floor during a group sleep-over (*id.* at 377-79); (6) cheerleader captains failing to communicate (*id.* at 109); (7) jump sequences for homecoming (*id.* at 119, 386-87); and (8) cheerleader coaches' gifts (*id.* at 110-11, 351-52, 358-60).  Mrs. Laningham complained about: (1) whether her daughter should be disciplined for being tardy (*id.* at 384-85); and (2) whether her daughter should be

disciplined for discussing details of her mother's sex life during class (*id.* at 387-92).   Mrs. Laningham complained that disciplining Sanches for telling her classmates about Mrs. Laningham's sexual history was sexual harassment of Sanches.  (*Id.* at 410-11.)

When Sanches was a junior at Creekview High School during the 2007-2008 school year, a rift developed on the varsity cheerleading squad between the seven junior girls and nine of the senior girls. (*Id.* at 261-62, 274-75, 287-90.)  The cheerleader coaches attempted to heal this divide by arranging opportunities for the squad to bond.  (*Id.* at 263-64.)  Bonding opportunities were unsuccessful and led to complaints from Mrs. Laningham. (*Id.* at 377-79.)

In January 2008, Mrs. Laningham submitted to Defendant pictures of four senior cheerleaders which she had discovered on a private Facebook page.  (*Id.* at 127, 291-92.)  The pictures depicted the cheerleaders at a local restaurant wearing chef's hats with inappropriate slogans written on the hats.  (*Id.* at 291-93.)  The pictures were taken at a private birthday party, and the cheerleaders were not in uniform. (*Id.* at 291-93.)  Defendant investigated this complaint and determined that the pictures were unbecoming for cheerleaders.  (*Id.* at 132-139, 254.)  As a result, the administration initially suspended the girls from cheerleading for three weeks.  (*Id.* at 132-39, 255-56.)  When the girls' parents complained about the severity of the discipline for non-school-related conduct, the administration reduced the suspension to one week.  (*Id.* at 255-256.)

Sanches' boyfriend had dated a senior cheerleader for three years before he began dating Sanches.  To protect the identity of the female student who Plaintiffs claim sexually harassed Sanches, the Court will refer to her in this opinion as "the Senior Cheerleader," at the same time recognizing that she was only one of several senior cheerleaders.  The Senior Cheerleader was involved in the Facebook incident.  (*Id.* at 291-92.) Mrs. Laningham made several complaints about

the Senior Cheerleader, seeking to have her removed from cheerleading for: (1) putting a pink streak in her hair; (2) having a small tattoo on her foot which was covered by her shoe and sock; (3) being late to cheerleading practice; (4) being disrespectful; and (5) allegedly having a party where both boys and girls spent the night at her house on New Year's Eve.  (*Id.* at  127, 140-49, 160-204, 208-24, 274-75, 290, 294.)  In fact, Mrs. Laningham wrote Defendant a letter listing the offenses and the demerits and punishments that Mrs. Laningham thought the Senior Cheerleader deserved.  (*Id.* at 140.)

During her senior year in high school, the Senior Cheerleader was repeatedly called to the office to respond to Mrs. Laningham's complaints.  (*Id.* at 286.)  The Senior Cheerleader stated that she was terrified of Mrs. Laningham.  (*Id.* at 284, 289-90.)  According to Plaintiffs, the Senior Cheerleader was upset about her suspension over the Facebook incident and threatened to "take down" the party responsible for turning in the pictures.  (*Id.* at 167-69.)  Plaintiffs complained about the alleged threat by the Senior Cheerleader.  (*Id.*)   Defendant investigated Plaintiffs' complaint. (*Id.* at 74, 167-69, 251.)

An inappropriate picture of Sanches also was found on Facebook. (*Id.* at 128-31.)  The administration investigated the photograph of Sanches and determined that Sanches should also be suspended from cheerleading for a period of one week.  (*Id.* at 74, 128-31, 251.)  Plaintiffs complained that this disciplinary action was harassment of their child.  (*Id.* at 6, 199.)  Following the Facebook incidents, Plaintiffs allege that the senior cheerleaders declared that they were going to make the cheerleading tryouts so hard that none of the juniors would make the varsity squad. (*Id.* at 166, 393-94.)  Plaintiffs complained about this alleged statement to Defendant.  (*Id.* at 166, 393-94.) Defendant told Mrs. Laningham that all candidates would be judged on the same routine by

independent third-party judges and that no candidate would have any advantage over the others. (*Id.* at 147.) However, this did not satisfy Plaintiffs. (*Id.* at 145-146.)

Plaintiffs complained that one of the cheerleading coaches "left the juniors out" while speaking at the cheerleading banquet. (*Id.* at 150, 202.) Plaintiffs complained that this humiliated the juniors and the coach needed to be held accountable. (*Id.* at 150, 202.) Plaintiffs accused one of the cheerleading coaches of "shoving" Sanches during a basketball game. (*Id.* at 170-171.) Defendant's investigation revealed that Sanches and her friends were talking to some boys during the national anthem and had refused to go to their correct positions. (*Id.* at 170-71.) The coach placed his hand on Sanches' shoulder, told Sanches and her friends to quit talking, and sent them to their designated places. (*Id.*)

In the weeks following the cheerleaders' banquet and well before cheerleader tryout for the subsequent school year, Plaintiffs hired legal counsel. (*Id.* at 198-204.) On April 9, 2008, Plaintiffs' counsel wrote the Superintendent a letter that: (1) detailed violations by the Senior Cheerleader and other senior cheerleaders; (2) demanded that certain administrators and the coach be "held accountable" for their actions and inactions; (3) demanded that Sanches be placed on the 2008-2009 varsity cheerleading squad without tryouts; and (4) demanded $7,500 in attorney fees. (*Id.* at 203.) Senior cheerleading parents had given Mrs. Laningham some original photographs to scan for videos at the cheerleading banquet; Mrs. Laningham refused to return the original photographs to senior cheerleading parents. (*Id.* at 153-58.) Mrs. Laningham informed senior parents that she had given the photos to her attorney and that she would not return their personal property until her demand that Sanches be placed on the varsity cheer squad was met. (*Id.* at 153-58.) After the senior parents engaged legal counsel, the photos were returned. (*Id.*)

During the time period immediately before the cheerleader tryouts, Mrs. Laningham continued to email Defendant.  (*Id.* at 151-52, 159.)  Mrs. Laningham emailed Michael Cone, a teacher at Creekview, requesting that the powder puff football game be moved to a different date because of the proximity to cheerleading tryouts and alleged concerns over a band trip.  (*Id.* at 151-52.)  Mrs. Laningham emailed cheer coach Monica Paul to indicate how and when the cheerleaders should prepare for the Spring show.  (*Id.* at 159.)

### Statement of Facts

### Plaintiffs' Claims of Allegedly Severe and Pervasive Sexual Harassment of Sanches by the Senior Cheerleader

Plaintiffs allege that at least five instances of "sexual harassment" of Sanches by the Senior Cheerleader constitute severe and pervasive female student-on-female student sexual harassment in violation of Title IX. (Pls.' Resp. 3-9.) During the Spring semester of the 2007-2008 school year, Sanches began a sexual relationship with the Senior Cheerleader's boyfriend of three years.  (Def.'s App. at 271-73, 335.)   On March 26, 2008, the Senior Cheerleader was on the way to class when she discovered her former boyfriend with Sanches.  (*Id.* at 281-82.)   According to Sanches, the Senior Cheerleader then allegedly stated that she was "in the presence of a 'ho'" and she would "kick [Sanches'] ass if [she, the Senior Cheerleader] wouldn't get kicked off [the cheerleading squad]."  (*Id.* at 172-182, 282; Pls.' App. at 00007, 00334.)   Sanches immediately called Mrs. Laningham who, in turn, immediately filed a complaint. (Def.'s App. at 172-182; Pls.' App. at 334.)   Defendant promptly investigated Mrs. Laningham's complaint about the Senior Cheerleader and removed the Senior Cheerleader from the fourth-period class that she had shared with Sanches. (Def.'s App. at 172-182.) Defendant mistakenly believed that by this point in the year, seniors were no longer performing cheer duties in the cheer class that the Senior Cheerleader shared with

9

Sanches. (*Id.* at 265, 284-85, 276-77.) The Senior Cheerleader admits that she stated "I am in the presence of a 'ho,'" but adamantly denies the part about "kicking her ass," explaining that she "would never lay a hand on this girl because I'm absolutely terrified of her mother." (*Id.* at 284.) The Senior Cheerleader still shared a cheerleading class with Sanches, but the competent summary judgment evidence shows that neither Sanches nor the Senior Cheerleader ever spoke to each other in the class. (*Id.* at 285.)

On April 11, 2008, Sanches was in the locker room when she noticed a red mark on her breast. (*Id.* at 184.) One of Sanches' friends stated that the mark looked like a "hickey." (*Id.*) Sanches claims that her boyfriend told her that the Senior Cheerleader told him that Sanches had a hickey on her breast. (*Id.* at 183-84, 276-79.) Sanches claims that the Senior Cheerleader circulated this rumor, but Sanches can't recall anyone that she heard repeat the rumor. (Pls.' App. at 00008-00009.) Sanches informed her mother that the Senior Cheerleader had started this rumor. (Def.'s App. at 183-84, 276-79.) Mrs. Laningham complained to Defendant, and Defendant immediately investigated the rumor. (*Id.* at 74, 184-85, 251, 276-79.) The Senior Cheerleader denied having said anything about Sanches, and the evidence established that she was not even in the locker room when the incident allegedly happened. (*Id.* at 185, 276-79, 308.) Plaintiffs claim that Defendant failed to conduct a complete investigation of the rumor because they did not interview Sanches' boyfriend. (*Id.* at 334; Pls.' App. at 00008-00009.)

Plaintiffs complained that the Senior Cheerleader backed Sanches up against the wall in the hallway, bragged that she was having sex with Sanches' boyfriend, and assaulted Sanches by wiping Sanches' hair and tears off her face. (Def.'s App. at 186.) According to Plaintiffs, the Senior Cheerleader "physically touched Sanches . . . in an effort to assert dominance over Sanches." (Pls.'

Resp. 3-4 ¶10; Pls.' App. 00010.)  The Senior Cheerleader contends that she saw Sanches in the hallway crying, stopped to speak with her, confirmed that she was having a physical relationship with the boy in question, and tried to comfort Sanches by telling her that the boy was "playing" both of them and was not worth Sanches' tears.  (*Id*. at 186-188, 306a-306c, 334.)  Defendant took statements from both Sanches and the Senior Cheerleader.  (*Id*. at 76.)  Both girls agreed that Sanches had heard a rumor from some other party concerning the Senior Cheerleader and Sanches' boyfriend and that when the Senior Cheerleader saw Sanches in the hall, Sanches was upset and crying.  (*Id*.)  Both students agreed that the Senior Cheerleader tried to comfort Sanches by wiping away tears.  (*Id*.)  There were differences in the statements about who wanted to talk to whom.  (*Id*.) No disciplinary action was taken against the Senior Cheerleader because it did not appear from either student's statement that a violation of the Student Code of Conduct or prohibited harassment had occurred.  (*Id*. at 74-76, 187-88, 251.)

Following cheerleader tryouts, Sanches and the Senior Cheerleader both continued to have a relationship with the same boy. (Def.'s App. at  275a.)  The young man in question discussed going to the prom with both girls.  (*Id*. at 275a, 327.)  One day in the hallway, the Senior Cheerleader patted the young man on the rear end and told him that he and Sanches made a cute couple.  (*Id*. at 306a, 308a-308b.)  Sanches reported to her mother that the Senior Cheerleader had touched her boyfriend.  (*Id*. at   408.)  Mrs. Laningham filed a complaint stating that the Senior Cheerleader had "sexually harassed" Sanches by touching the boy's rear end.  (*Id*. at 208.) Defendant investigated this matter; Mr. Mayfield took a statement from the boy who indicated that he did not take offense or suffer an injury and that the incident was "no big deal" to him.  (*Id*. at 76.)

Defendant determined that the Senior Cheerleader had not sexually harassed either the boy or Sanches.  (*Id*. at.74-77, 208-14, 251.)

Mrs. Laningham alleged that the Senior Cheerleader sexually harassed Sanches by starting a rumor that the Senior Cheerleader was pregnant by Sanches' boyfriend and asking another student to tell Sanches.  (*Id*. at 215-19, 336-38.)  Plaintiffs contend that this is a "sexual dominance rumor" started by the Senior Cheerleader to "assert sexual dominance over Sanches and show Sanches that [Sanches' boyfriend] was still [the Senior Cheerleader's] property."  (Pls.' Resp. 4 ¶ 11.)   This rumor was untrue and prompted a complaint from the Senior Cheerleader's parents. (*Id*. at 216, 218, 337, 309.)  Defendant investigated this rumor and could not determine who started it.  (*Id*. at 74-77, 217-19, 251.)  Sanches admitted that Sanches was involved in spreading the rumor and that the Senior Cheerleader never spoke directly to Sanches about it.  (*Id*. at 77.)  The Senior Cheerleader adamantly denies having started the false rumor about her own pregnancy by her ex-boyfriend; states that questions about it are very personal and embarrassing to her; and further states that she wishes  that the allegations could be stricken from the lawsuit.  (Pls.' App. 00108.)  Defendant determined that the incident did not constitute sexual harassment of Sanches by the Senior Cheerleader.  (Def.'s App. at 77.)

## Plaintiffs' Claimed Incidents of Gender Discrimination that Allegedly Created a Hostile Educational Environment

Plaintiffs allege that the following incidents constitute gender-based harassment (non-sexual) which created a hostile educational environment that deprived Plaintiff of equal opportunities for education.  (Pls.' Resp. 4 ¶16.)

On March 8, 2008, the senior cheerleader captain read a letter to her fellow cheerleaders about her disappointment over her last year as a cheerleader.  (Def.'s App. at 160-65.)  In her letter,

the captain referenced her own difficulties as a result of being harassed by parents, never identifying any particular parent.  (*Id*. at 164-65.)  Plaintiffs felt that this letter was exclusively directed toward them and complained to Defendant.  (*Id*. at 160-63.)  When questioned by Plaintiffs' counsel at her deposition, the captain stated that the letter was about her own problems and that the letter was not just about Mrs. Laningham.  (Pl.'s App. 00088.)  She acknowledged that everyone knew about her conflict with Mrs. Laningham and that people could recognize that conflict might have been part of the letter.  (*Id*.)  Defendant investigated this matter but did not determine that any disciplinary action of the captain was warranted. (Def.'s App. at 74, 160-163, 251.)  Plaintiffs contend that this is evidence that Sanches suffered a hostile educational environment because the District allowed the captain to read this letter "lambasting Sanches' family."  (Pls.' Resp. 4 ¶16.)

In March 2008, the cheerleaders held their annual banquet. (Def.'s App. at 397a.)  During the banquet, the Senior Cheerleader placed a chef's hat on her head, reminiscent of her Facebook photo.  (*Id*. at 294a-294b, 397a-397b.)  District administrators immediately made the Senior Cheerleader remove the hat. (*Id*. at 256a-256b, 294a-294b, 397a-397b.)  Plaintiffs submitted a complaint about this incident.  (*Id*. at 150.)

During the week of cheerleader tryouts for the 2008-2009 school year, Sanches and her parents claimed that the Senior Cheerleader continued to "harass" Sanches. (*Id*. at 330-32.)  This alleged harassment consisted of "dirty looks" and the Senior Cheerleader speaking to her friends about Sanches' boyfriend while she was in Sanches' presence.  (*Id*.)  Plaintiffs complained to Defendant regarding this alleged harassment. (*Id*. at 5-14.) Defendant investigated this complaint, determined that it was unsubstantiated, and decided that no action was necessary.  (*Id*. at 74- 76, 251.)

One of the senior cheerleaders, KH, was a very close friend of Sanches. (*Id*. at 300-01, 333.) The other senior cheerleaders feared that KH was giving Sanches special tutoring so that she would have an advantage over the other cheerleading candidates for the upcoming school year. (*Id*. at 189-97, 300-01, 303-04, 329.) On April 14, 2008, the Senior Cheerleader and other students were driving home from classes they were taking at Brookhaven College. (*Id*. at 187-97, 300-01.) One of the students lived on the same street as Plaintiffs. (*Id*.) As the girls drove by Plaintiffs' house, they stopped in front of the house to see if KH was there helping Sanches with the tryout routine. (*Id*.) Neither Sanches nor KH was at Plaintiffs' home. (*Id*. at 300-01, 329a.) The Senior Cheerleader joked that it would be funny to ring Plaintiffs' doorbell and run away. (*Id*. at 300-01.) The Senior Cheerleader got out of the car, but did not step on Plaintiffs' property. (*Id*. at 189-97, 300-01.) Mrs. Laningham saw the girls in the road and chased them down the street. (*Id*. at 300-01.) The Senior Cheerleader and two other cheerleaders immediately informed their cheerleading coach and Creekview administration about what they had done. (*Id*. at189, 196-97.) Defendant investigated the matter and took written statements from the girls. (*Id*. at 190-95.) Although the Senior Cheerleader had not actually rung Plaintiffs' doorbell or set foot on Plaintiffs' property, she and the other two cheerleaders acknowledged that they had used poor judgment by stopping in front of Sanches' house. (*Id*. at 191-302.) On April 16, 2008, Defendant determined that due to the three senior cheerleaders' lapses in judgment, they would not be allowed to participate in the tryout clinic for incoming cheerleaders. (*Id*. at 196-97.)

The Senior Cheerleader and two other senior cheerleaders felt that the Creekview administration had not supported them during what the cheerleaders considered to be Mrs. Laningham's campaign of harassment. (*Id*. at 297-98.) Senior cheerleaders had spent significant

amounts of time choreographing the dance routine and preparing for tryouts. (*Id*. at 196-97, 297-98, 303-06.)  The Senior Cheerleader and two other senior cheerleaders immediately resigned from cheerleading, blaming their resignation on disappointment from not being allowed to participate in the tryout process.  (*Id*. at 196-97, 297-98, 303-06.)  The other senior cheerleaders, with the exception of Sanches' friend KH, also resigned from cheerleading. (*Id*.)  Following the resignation of the senior cheerleaders, rumors were started that they had "vandalized" Plaintiffs' home. (*Id*. at 306.)  The seniors requested the opportunity to address the remaining cheerleaders to quell these rumors; however, their coaches did not feel that this was productive.  (*Id*. at 297-98.)  Mrs. Laningham complained that the fact that the girls asked to talk to the squad and address the rumors was further harassment of Sanches.  (*Id*. at 10, 402.)  Later that day, three of the senior girls were in the hallway and one of them commented that, because of Sanches' mother, their friends were being questioned by lawyers.  (*Id*. at 11.)  Mrs. Laningham complained that the seniors were attending the tryout clinic after they had resigned.  (*Id*.)  The District investigated these matters and determined that Mrs. Laningham's claims about what had happened were false. (*Id*. at 1-40.)

On April 18, 2008, cheerleader tryouts were held for the 2008-2009 school year.  (*Id*. at 17, 205.)  Three trained independent judges from an outside cheer organization were responsible for scoring the performance of the cheerleading candidates. (*Id*. at 18.)  All candidates were judged on the same criteria and performed the same cheer and dance routine.  (*Id*. at 17, 206-207.)  Based on Sanches' performance compared to the performance of the other candidates, the three independent judges ranked Sanches lower than the sixteen girls chosen for the 2008-2009 varsity cheer squad. (*Id*. at 414.)  Plaintiffs were dissatisfied when Sanches did not make varsity cheerleader and filed a formal grievance with the District.  (*Id*. at 1-73.)  In this grievance, Plaintiffs argued that the

scoring by the three independent judges was fixed and that Sanches was unfairly scored lower than other girls whom she had outperformed. (*Id*. at 12-13, 55.) Plaintiffs argued alternatively that if Sanches had not performed well, it was the fault of the senior girls who had purposely made the routine too difficult. (*Id*. at 13.) Plaintiffs' grievance was heard by two CFBISD administrators who had not had any previous involvement with the incidents forming the basis of Plaintiffs' complaints. (*Id*. at 1, 15, 236a-236c.) Plaintiffs were represented by counsel at these grievance hearings. (*Id*. at 1, 15, 402-406a.) Neither of the hearing officers found any basis to grant Plaintiffs' requested relief. (*Id*. at 4, 19, 402-406a.)

On August 21, 2008, the CFBISD Board of Trustees held a Level III hearing on Plaintiffs' grievance. (*Id*. at 406a.) The CFBISD Board of Trustees determined that Plaintiffs were not entitled to their requested relief. (*Id*.) During the pendency of their grievance, Mrs. Laningham continued to complain about the senior girls. (*Id*. at 13, 223-24, 407.) Mrs. Laningham claimed that the seniors celebrated Sanches' failure to make cheerleader by: (1) gathering outside to see Sanches' disappointment (*id*. at 13); (2) commenting that Sanches should be embarrassed because she was not chosen as a cheerleader (*id*. at 223-24); and (3) mocking Sanches on Facebook (*id*. at 407). The District could not substantiate the complaints brought to their attention. (*Id*. at 1-40, 223-24.)

The District took seriously the voluminous emails and calls from Mrs. Laningham and the concerns she expressed. (*Id*. at 236.) The school staff spent hundreds of hours investigating Mrs. Laningham's complaints. (*Id*.)

## **Analysis**

Taking the facts most favorably to Plaintiffs, the Senior Cheerleader walked into the fourth-period class which she and Sanches shared and announced, "I am in the presence of a 'ho' and

would kick her ass if it weren't for cheerleading"; started a rumor that Sanches had a hickey on her breast; maneuvered Sanches up against a wall in the hallway to brag that she was having sex with Sanches' boyfriend and wiped hair and tears from Sanches' face; patted Sanches' boyfriend on the bottom and said sarcastically to Sanches that Sanches and her boyfriend made a cute couple; and started a rumor that she (the Senior Cheerleader) was pregnant by Sanches' boyfriend.  Plaintiffs filed complaints with Defendant with respect to each of these alleged occurrences.  Defendant investigated each of these incidents and removed the Senior Cheerleader from the fourth-period class that she had shared with Sanches for making the remark about a "ho."  Defendant did not remove the Senior Cheerleader from cheerleading class because it believed that senior cheerleaders were no longer attending the class at that time of year.  When the Senior Cheerleader did attend the cheerleading class, neither she nor Sanches spoke to each other.  With respect to the rumor that Sanches had a hickey on her breast,  the Senior Cheerleader denied having said anything about Sanches, and Defendant established that she was not even in the locker room when the incident allegedly happened.  (*Id*. at 185, 276-79, 308.)  Defendant investigated Plaintiffs' complaint that the Senior Cheerleader backed Sanches up against the wall and assaulted her by wiping her hair and tears off her face and determined that no action against the Senior Cheerleader was warranted.  (*Id*. at 74-76, 187-88, 251.)  Defendant investigated Plaintiffs' complaint that the Senior Cheerleader touched Sanches' boyfriend, took statements from the students, and determined that the Senior Cheerleader had not sexually harassed either the boy or Sanches. (*Id* at 74-77, 208-14, 251.)  With respect to Plaintiffs' claim that the Senior Cheerleader actually started a rumor about her own pregnancy to sexually harass Sanches, Defendant investigated this matter and could not determine

who started the rumor, although Sanches admitted being involved in spreading it. (*Id*. at 74-77, 217-19, 251.)

Under Title IX, student-on-student sexual harassment is actionable only where the behavior at issue denies a victim equal access to education. *Davis*, 526 U.S. at 652. The harassment must have a "concrete, negative effect" on the victim's education. *Id.* at 654. Examples of a negative impact on access to education may include dropping of grades, *id.* at 634; becoming homebound or hospitalized due to harassment, *see Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1248-49 (10th Cir. 1999); or physical violence, *see Vance v. Spencer County Public Sch. Dist.,* 231 F.3d 253, 259 (6th Cir. 2000). Here, there is evidence that Sanches' grades dropped from B's to C's and that she was diagnosed with depression. However, there is no evidence that her absenteeism increased. Nothing in the record shows that she was denied any educational opportunities by the Senior Cheerleader's actions or by Defendant's response.

However, even if the Court were to decide that the Senior Cheerleader's actions were severe, pervasive, and objectively offensive sexual harassment that had a concrete, negative effect on Sanches' access to education, Plaintiffs have failed to raise a genuine issue of material fact to show that Defendant's response to known harassment amounted to deliberate indifference. Plaintiffs gave Defendant actual notice of each incident that they deemed to be sexual harassment. *Davis* imposes on Defendant a duty to act in response to these notices. However, as long as the school's response is not "clearly unreasonable," it cannot have acted with the deliberate indifference required to incur Title IX liability. *Davis,* 526 U.S. at 648-49. According to *Davis,* this is not a mere reasonableness standard, nor does it require funding recipients to remedy peer harassment. *Id.* Indeed, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, summary judgment, or

directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649. This case is appropriate for summary disposition on this ground. The record reveals that Defendant's response to Plaintiffs' complaints was not clearly unreasonable. After each reported instance Defendant conducted an investigation. Plaintiffs were never satisfied with any investigation, but their dissatisfaction does not show that Defendant's actions were clearly unreasonable. Defendant disciplined the Senior Cheerleader by removing her from the fourth-period class she shared with Sanches in the one instance when they were able to substantiate that the Senior Cheerleader had used the word "ho." Defendant's mistaken belief that the Senior Cheerleader would not be attending cheerleading class with Sanches is not evidence that Defendant acted with deliberate indifference. The deliberate indifference standard does not require a school district to effectively end all interaction between two students or to prevent conclusively any further harassment. *Davis* does not require funding recipients to remedy peer harassment. *Id.* at 648-49. *Davis* disapproved of a standard that would force funding recipients to suspend or expel every student accused of misconduct. *Id.* All that *Davis* requires is that the school not act *clearly unreasonably* in response to known instances of harassment. *Id.*

Here, Defendant was dealing with parental allegations of harassment and "sexual dominance," with rumors, and with determining who, in a high-school setting, started rumors. Defendant did not clearly act unreasonably as a matter of law by investigating each complaint and acting only in the instances in which harassment or rule violations could be substantiated. As *Davis* noted, courts should refrain from second-guessing the disciplinary decisions made by school administrators. *Id.* at 649; *cf. Ulichny v. Merton Community School District,* 249 F.3d 686, 706 (7th Cir. 2001) (opining that school administrators should be supported, rather than second-guessed, in

their "heroic efforts" to teach our nation's young people).  Therefore, considering the surrounding circumstances, expectations, and relationships, including the ages of the students and the fact that adolescents do not always exercise good judgment, the Court finds that the alleged harassment was not so severe, pervasive, and objectively offensive that it denied Sanches access to educational opportunities.  *See Davis*, 526 U.S. at 651.

### <u>Conclusion</u>

Even assuming that a genuine issue of material fact exists with respect to the "sexual harassment" and the "severe and pervasive" prongs of the *Davis* test, Defendant's response was not so clearly unreasonable as to render it liable under Title IX.  Plaintiffs have failed to show that a genuine issue of material fact exists as to whether Defendant acted with deliberate indifference to Plaintiffs' allegations of sexual harassment.  Further, there is no competent summary judgment evidence which raises a genuine issue of material fact with respect to Plaintiffs' claims of unconstitutional gender bias, or a widespread, consistent pattern of misconduct by Defendant. Defendant's Motion (doc. 35) is GRANTED.  Accordingly, the Court will enter judgment in favor of Defendant.

As the prevailing party, Defendant is entitled to costs.  Additionally, Defendant seeks attorney fees pursuant to Title IX of the Educational Amendments of 1972 and Fed. R. Civ. P. 11. In cases such as this, however, where the substantive law does not require that fees be proven at trial,

"[a] claim for attorney's fees . . . must be made by motion . . . ."  FED.R.CIV.P. 54(d)(2)(A).  The

Court will therefore make no decision regarding attorney's fees pending such motion.

SO ORDERED, September 17, 2009.


PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE